We call the first case for today, 2015-30107, Monumental Task Com, Inc. v. Anthony R. Foxx, et al. Good morning, Your Honors. I am Franklin Jones, Counsel for the Monumental Task Committee, Louisiana Landmarks Society, Foundation for Historical Louisiana, and Beauregard Camp 130. I will show you this morning that based on prior decisions of this Court and the evidence in the Record on Appeal, the risk of irreparable physical damage and injury to the four monuments at question is so great if the City attempts to move them, and the cost to the City of letting them remain in place is so small that this Court should grant an injunction, the preliminary injunction requested from the District Court, unless there is no chance whatsoever that any of the plaintiffs can prevail on any of the causes of action. Has there been a change in facts since Judge Barbier entered the decision in this case with regard to the crane situation? Yes, ma'am. And should we remand because of that? I'm going to ask the other side that question too. The crane situation? Yes. Yes, ma'am. The crane, the company that was the professional best thing in the opinion for some length of time is not involved in this project, as I understand it, but maybe I'm wrong on that. Yes, ma'am. The City, I mean, the City countered or attempted to counter the expert reports that the plaintiffs put into the Record, first from Larry Robichaux and second from Thomas Bruno, with an affidavit from a demolition contractor named Warren Shambo. He, Mr. Shambo, told the Court that the — he had hired all crane of Louisiana, and he said it was one of the most reputable and experienced crane companies. He said it had done high-risk lifts in the construction industry and that it was more than qualified. Right. But that company is not involved in the project at this time? It was not involved. Correct. And I — it was not involved, but more important, Judge — Is it currently, today, involved in the project? Will it be the company with the professional experience to make sure the monuments aren't damaged? There's no way to know. There's no way to know. Judge Barbier relied on Mr. Shambo's affidavit. He said all crane is a high-performing company. Judge Barbier said all crane is in the top handful of companies to be engaged in this kind of work before the case left Judge Barbier's Court. So it's in the record on appeal. All crane announced that they had nothing to do with this case. Mr. Warren Shambo said — and it's in the record on appeal — that he had never hired all crane, really calling into question why the city introduced an affidavit saying that he had hired them. Does the city have — I guess I'll ask the city this. Do they have evidence in the record that there is another reputable crane company that will make sure it's not damaged? Mr. Shambo addressed that question, and he said he contacted all of the reputable companies, all of the companies he thought could handle it. There's only a handful of them, and it's in the record on appeal. None of them wanted to get involved in this project. So all of the evidence on this point suggests that the risk of irreparable physical harm to these monuments is substantial. There's nothing in the record on appeal that would warrant Judge Barbier an affirmance of his opinion. Okay. I have several questions, so I'm just — Yes, ma'am. — getting to them kind of quickly, if possible. What — the district court did not convert this into a hearing on the merits, apparently. And did anybody request that? I don't know what remains to be done in the district court, what other information would be put on at the time of trial. Normally, in a case like this, it would be converted, perhaps. But maybe someone didn't — said, please don't. So what remains to be done? The judge allowed the parties to introduce stipulated witness testimony, allowed the parties to introduce expert testimony, allowed the parties to introduce exhibits. I think the question was, did they consolidate the preliminary application for preliminary injunction on the merits? And I think the answer to that is no, but the question — The answer is no. Is there any practical reason why that isn't the situation? I don't believe anyone asked the judge to do it, and I don't believe he did it on his own volition. So what remains to be done? Will all this — will all be put on again? And when is that hearing scheduled? I'm trying to decide. This is a stopgap in the middle of a case, in the posture that it's presented. So when is the hearing, and what's going to be done there? Well, if the injunction is granted, which we certainly hope that it will be, then we will return to district court, and we will begin the process of doing discovery to find out information to flesh out and fill in the few gaps that remain to be filled in with respect to the facts. Well, even if the injunction isn't granted, won't you proceed on the merits that you were entitled to? We will. Yes, ma'am. Yes, ma'am. We will go back to district court. But we don't have a date for that? I mean, we can't say, oh, well, this is only for a month, and so we should wait until the merits are not wait because it's going to be six months. There's no date? There's no date, Your Honor. Counsel, you've begun with the irreparable harm problem. Is your argument that Judge Barbier's finding of no existing actual present threat of irreparable damage, is that — is your argument one that he committed clear error of fact? Your Honor, I think that is a mixed question of law, in fact, as to whether there is a demonstrated risk of irreparable injury to the monuments. And I believe that, in fact, Judge — Would you quote any of the expert testimony, the portion that you rely on most to show that he committed a clear error, finding that there's no irreparable damage, likely threat of irreparable damage? Quote the expert testimony? Yes. I did not, in our — Just right now, quote me what it is that's in the record that's most undermining of his conclusion. Yes, sir. Number one, Larry Robichaud has been a crane in rigging experts. I know what Robichaud is. Quote me the statement that you say — He said that it is impossible to determine the midpoint on the left. And when you do not know the midpoint, you do not know where to place the sling. And when you don't know where to place the sling, when you lift the load off the ground, it swings and gyrates, and it moves. And the appendages are subjected to centrifugal force that will — Okay. But that sounds to me like he made a conclusion that it's possible a skilled or, I guess, unskilled crane operator might not find the midpoint. It is — the plaintiffs are not required to prove the certainty — They need to prove likelihood, though. Larry Robichaud's affidavit, uncontested by anything from the city, proves the substantial likelihood of irreparable injury to those miners. That's your contention. Okay. Legally, you're — in the district court, at the hearing, Judge Barbier said to you, is there any case that stands for the proposition that the Roman phrase codified at 2297 that you rely on to prove a property interest goes beyond a claim for compensation to vest you with a property right? And at that time, you said, yes, there is, but we haven't had time to find one. So I'm asking you a very specific question. What is the case that extends that doctrine to give you a property interest? I believe the cases are cited in the brief.  Not whether it's cited in your brief. What is the case that stands for that proposition? And I'll keep asking while you go back there, because your brief at page 8 begins the entire argument saying you don't need to describe the cascade of errors he committed because they all turn on the central finding, the district court's finding that you claim is error, that you have a property right in these monuments. So what is the case interpreting that provision that gives you a property right? Your Honor, we never claimed, and we do not claim today, we own the monuments. I know. What case stands for your claim that he erred legally when he didn't extend 2297 to vest you with a property right? Cook-Patrick v. Young, 456 Southern 2nd, 622 Louisiana, 1984. And you're saying that stands for the proposition that negotiorum gestio gives you a property right? It stands for the proposition that Monumental Task Committee has a recognizable property interest. Usually when I encounter phrases, you know, Latin phrases that are difficult, I start with Black's Law Dictionary. And I did in this case, and Black's Law Dictionary cites Kent's commentaries on American law that explicitly say that this doctrine does not vest the gestor with a property interest. I think the Louisiana case is just contrary, Your Honor. Okay. You would have to say that. And that's the case that you say stands for that proposition? Your Honor, Standard Motor Car Company v. State Farm, 97. Okay. So you're saying both cases. Yes, sir. Clarify that that doctrine gives someone a property interest in the item that they benevolently manage. If they don't have a property interest, Your Honor, they would have no right to seize the thing. They would have no right to make a quasi-in-rim claim against the thing. I believe the State Farm, Standard Motor Car Company v. State Farm case does recognize that the gestor has a property interest in the thing. What property interest? The right, well, the right at a minimum to be compensated for its effort. Precisely. But you said at a minimum. But can you tell me, articulate any legal theory that it's any more than that? Well, if we're talking strictly monetary, monetary interest, I would say there's no case that would say the Monumental Task Committee has a protected property interest. My question is can you cite me any legal authority that recognizes any property interest where it characterizes that other than some possible right to be compensated? Not other than that. But that doesn't — No, no. No, I cannot, Your Honor. I cannot. So you're here bereft of any authority to support an injunction? No, Your Honor. Then what is it? Well, that's only — No, let me finish. Just because you think that there's a possibility that there may be some damage to that, it goes to the factor that ought to be factored in, yes. But the predicate to this is that you have some possibility, at least some articulable legal theory to sustain your proposition. And so far, I haven't read it or heard it. Well, Your Honor, we're only talking about the Monumental Task Committee. And the basis of their interest is Negotiorum Gestio. Beauregard Camp — We just went through that. Beauregard Camp 130 has a property interest because they are the party, the successor in interest to the party that paid for the monuments. Can we go through these interests? Okay. Is either one of the plaintiffs a successor to Trivoli Circuit? I mean, the one on Lee Monumental Association. Is any of the plaintiffs successors to the Lee Monumental Association that was granted by ordinance the right to place the Lee Monument? None of these parties are legal successors to the Lee Monumental Association. Okay. Are any of these parties successors to the Beauregard Monumental Association? Yes, ma'am. Beauregard Camp 130 is the legal successor. The information was put into the record on appeal, put into the record with the district court. Do they have an actual legal interest in the land because the land was donated to the Beauregard Monumental Association? I've gone and tried to — because I didn't think that, frankly, your brief helped me with this. I've gone and tried to trace the land and who owns the land. And I — Well, Your Honor — This one, I actually think there might be a legal land interest because they were granted the land. That is in our complaint, Your Honor, in the page limitation on the briefing. We could not repeat everything that we — Is that asserted anywhere in your brief? In the brief? Yes, as a property interest theory as to that particular monument. Just give me the page of your brief. In the brief, no. In the record on appeal, yes. So you argue that they own the land? You didn't make that argument? And that's — I mean, it's possible. We have made that argument, Your Honor. Let me clarify something. You keep talking about it's in the record on appeal. But as I listen more closely to what you're saying, you've been supplementing the record after the district court ruled? Well, we didn't supplement the record per se. We filed a motion for a stay pending appeal. But there was nothing in that motion that addressed the monumental — What I want to know — You can't really come — start adding things on — dropping it in the district court and dropping it up here after you have a denial of a stay. In other words, the case is on appeal. And whatever is in that record is in the record. But I don't mean to — I'm just trying to understand what you're saying. Well, I appreciate what you're saying. You very carefully phrased that about whether it's on appeal. I mean, it's now in the record. But I don't understand. You have a case that's still down in the district court. I got the impression from what you were saying, and I want you to correct it if I'm mistaken, that you've been going back to the district court and continuing to file affidavits while this case is on appeal. I apologize if I gave that question. No, that's not correct, Your Honor. Well, fine. Tell me what is the situation. The record on appeal is absolutely filled with the exhibits and the testimony that shows Beauregard Camp 130 is the legal successor to the Beauregard Monumental Association  funded not just that monument but then went to the Louisiana Historical Society for the enhancement and maintenance of many other monuments, including the Davis Monument. Okay. Can you tell me where in the record it says that the Beauregard Group is the successor to the Beauregard Monumental Association? It does say in the record that the land was donated to the Beauregard Monumental Association at ROA 298 and 303-304. But where does it say in the record that those plaintiffs are the successor to this group who bought the land donated? It's in a stipulated witness testimony, Your Honor. Where? I don't have the page number with me this morning. It is a portion of the stipulated witness testimony. Who's stipulated witness testimony? It is a man who has been a member of Beauregard Camp 130 since the 1960s. What's his name so I can easily find it? May I supplement with a letter to the court and include that, Your Honor? I suppose that you can each file 28 Js on this issue if you wish to do so, and I give you each two minutes extra because I still have questions about the land ownership of Jefferson Davis Monument and Liberty Place Monument. Your Honor, the opportunity to explore that further is what we want to do in the district court. Okay. I just want to... You have to have this stuff in the record now because we have to review it to see if there is any cognizable legal interest. So the Davis Monument, it's the Davis Monument Association. Is one of the plaintiffs a successor in interest to the Davis Monument Association? Not a direct legal successor, but the funds raised by Beauregard, the Beauregard Monumental Association, went to the Louisiana Historical Society, and they used money to maintain other monuments in the city, including the Beauregard Monument. That only takes you to the point... That only takes you back to where you started. The fact that they used money to maintain it is best going to create any interest, any possible interest that it does create, it's purely one of compensation. Your Honor, it starts with compensation. Admit it. It starts with compensation. But what we're asking this court to do is not decide on the merits, but rather just give us the chance to go to the district court with the status quo maintained so that we can pursue and explore these issues fully. Remember, Your Honor, this is a case that has never had the first bit of discovery. Everything we've been able to show the court came from the public domain, from the public record, from our own archives. We're asking this court for one simple favor. Maintain the status quo. Because there are serious legal questions. Due process, equal protection, ownership of the monuments. Maintain the status quo. Those are questions that you're throwing out, but I don't hear any record basis before us of any legal theory, frankly. I understand you throw these things out and we just want an opportunity to pursue, but this is where we are, and this is the time to put it on the table if you got it. If you don't, you don't. And we haven't covered Liberty Place. Your Honor, I apologize. You're mistaken. Can you help me with Liberty Place? May I answer Judge Higginbotham? Oh, okay. I'm sorry. Beginning at page 7, we talked about negotiorum gestio. We talked about the interests that the parties have. No, you didn't. I'm not going to... I'm not here to engage you in an argument. I'm just here to tell you that, for whatever value it may be to you, you just went through the negotio period. You circled back to that. Language such as we want to explore this to develop a legal theory sounds very much like you don't have one, and I frankly haven't heard one that I think is cognizable or anything other than a property interest, and you've gone back to negotio or whatever. Pardon me. It's an unusual term, and I had to go to look at that. Your Honor, we've only focused on two of the plaintiffs, Louisiana Landmark Society and Foundation for Historic Louisiana. But you did just focus on them. You said what their relationship to the monuments were that they would maintain. They spent money to maintain them. No, they have their property rights, their rights recognized under the National Historic Preservation Act and the Department of Transportation Act. They have a right to the aesthetic and environmental, to have the aesthetic and environmental interests recognized. We focused on property interests because that's what Judge Elrod asked me about. But we have several other interests as well. What do the streetcars have to do with this? Your Honor, I can thank you for asking because I've been waiting months to be able to say. In the 1980s and 1990s, the City of New Orleans accepted tens of millions, if not hundreds of millions of dollars to build those streetcar lines. They had to comply with Section 106 of the NHPA and Section 4F of the Department of Transportation Act. They did so. They could not have removed those monuments while the streetcars were being renovated or built. They can't wait a few years later, having accepted that federal money, having promised to abide by the NHPA and the DOT Act. Are they going to have to move any streetcar lines to take those things down? No, sir. My understanding is it's at least a quarter of a mile to any streetcar line for many of these monuments. Your Honor, it is absolutely clear the City could not have moved Borgard, could not have moved Davis, could not have disturbed Lee while the streetcars were being renovated because they accepted $100 million of federal money to do those projects. Counsel, I mean, I don't know what your time situation is, but I just have one question. When you move to your arguments as to the federal defendants and the streetcars, back to what's in your brief before us, that's preserved. You make that argument on page 13, one page of argument. Did you cite a single case as authority for this federal defendant argument? Your Honor, our briefing to the district court — Did you cite to us the argument you're presenting to us, as opposed to what may be in the record about success or failure? No. In the limited number of pages, allowed — Okay. And then in your reply brief, did you say, in fact, the argument as to the federal defendants is irrelevant to the present appeal? No, they're not irrelevant. Well, I thought that's the word you used in your reply brief, that the arguments are irrelevant to the instant appeal. I apologize if I said something incorrectly, Your Honor. No. We believe they're relevant because we have National Historic Preservation Act claims. Please give each side three more minutes. We have NHPA claims and the Louisiana Landmark Society and Foundation for Historic — Again, the argument that I think we have in front of us is the argument you give us to the brief. So I'm going to quote from your reply brief. Failure to brief the statutory claims against the federal defendants or the claims against the RTA is not abandonment because they are irrelevant to this underlined appeal. What did you mean by saying that the arguments as to the federal defendants, the RTA, are irrelevant to this appeal? Your Honor, right now I can't tell you exactly what I had in mind. They are absolutely critical to this appeal. Perhaps it's a drafting error or an editing error. But the thing is, please don't look at one word. Everything we've done in this case has focused on—not everything. Much of what we've done has focused on the federal claims, National Historic Preservation Act. Now the city of New Orleans wants to move— I understand, and there are bits and pieces in the record about who may have been originally donated land. But I'm looking at the arguments you're presenting to suggest reversible error by Judge Barbier. Your Honor, perhaps I misunderstand what the purpose of the briefing is. It's to highlight the main points that you want to present to the court of appeals. I don't believe by any—that we've been held to waive all of the arguments that we made in the district court. We haven't suggested the purpose of briefing because briefing, you have to put it in the brief to preserve it. Your Honor, that—all I can say is that's exactly why we touched on it on page 13 and 14 of our original brief, to remind the court that these are not—these claims are not abandoned. These claims are not irrelevant. I apologize if I've said something that makes it appear that way. They're critical because we recognize the property right—not right—property interest asserted by Monumental Task Committee. Okay, what is the interest in Liberty Place? We never did cover that one. Who—do the plaintiffs have an interest in—that's the final one. I covered the other three. Absolutely. Louisiana Landmarks Society is one of the plaintiffs. In the original action from the 1990s, the Louisiana Landmarks entered into a consent order. Right. Does the consent order give a dominant easement or whatever the Louisiana equivalent of that is? Or does it give a property—an ownership interest? No, ma'am, it doesn't give an ownership interest. It gives the right—it gives Louisiana Landmarks the right in the proper federal forum to enforce that consent order or to prevent the city from abandoning the consent order. So the Liberty Monument is absolutely the anchor of all of the federal claims because the city and the federal government have agreed to let it remain in place essentially in perpetuity because that's what the consent order says. Did the order argue to the district court that you actually have to go behind and see if the consent decree should continue to be in effect, like you do in school litigation or something to see if you could—if it still needs to remain? Did you argue that? The parties agreed to set that issue aside. The city of New Orleans agreed that regardless of what happens in this proceeding, regardless of what happens in this proceeding, they would not move against the Liberty Monument. And that's key because the Liberty Monument, the ordinance that declared it a nuisance, is the same ordinance that declared the Lee, Beauregard, and Davis monuments to be nuisances. I think we have your argument, and you have saved time for rebuttal. Thank you for the opportunity to be heard, Your Honor. Good morning, Your Honors. My name is Adam Swincik, and I represent the city of New Orleans and Mayor Mitch Landrieu. I'll be taking 18 minutes and dealing largely with all questions but the statutory questions, though I am, of course, happy to answer any questions. The NHPA claims and the DOT Act claims, though I'm happy to answer any question raised in our brief. Your Honors, this case is ultimately a simple question of whether the city has the power to remove its property. It turns on a simple and firmly settled question of Louisiana law that has been true for decades, if not centuries. Namely, a public body has the power to remove a public thing from the public right-of-way, however it does. If the city council can put it up, we can take it down. It is a matter of local governance. The legal position you're saying would be no different if your intention were to demolish it. Absolutely. But you would concede they would have an irreparable harm prong. Your Honor, there is absolutely no evidence that the city of New Orleans intends or will tear these things down forcibly. True. But nevertheless – The legal position you're arguing is one that would vest you with authority to tear them down as well as relocate them. We certainly – that certainly falls within the authority of the city. I do think there is an important distinction to be made between damage to a monument and the irreparable harm to the opponents themselves. None of the statues are plaintiffs in this case. The 1874 monument, beyond the irony of it arguably being the most offensive, yet least easy to relocate, is there no tension between the fact that you're claiming they've got no Federal claim and the fact that it is because of a Federal court that that one has more permanence? Your Honor, there may be some irony to the fact that that is the most difficult one to remove. Nevertheless, the Liberty Place is really not before this court. What's the status of the counterclaim? The status of the counterclaim, we have filed a counterclaim. The Federal defendants have filed a Rule 12b6 motion, and it's currently pending with the district court. But that's not subject to this appeal, and so we should put Liberty Place to one side, and it's not going to be demolished. No, ma'am, Your Honor. We have told the district court that we will not move forward unless and until we get the blessing from the district court. So this is a three-monument appeal? Absolutely, Your Honor. The district court appropriately applied the four preliminary injunction factors in this case and is imbued with vast discretion. First and most importantly, appellants have failed to demonstrate a single viable claim on which they have even a remote chance of success at trial. On the Beauregard Monument, do they have a land ownership because the land was donated to the Beauregard Mon — the land was actually donated to the Beauregard Monumental Association? They do not, Your Honor. Can you explain that? There is no evidence in the record that the — apart from the bald assertions of the plaintiffs — that the land that is City Park was donated to the — The portion where the little monument is. I mean, where the big monument is. The little portion. Right, Your Honor. But let's talk about a couple important State law points that govern that. Number one, it's undisputed, and we've cited a case, I believe it's in the underlying briefing, City of New Orleans v. the State of Louisiana, that recognizes that City Park is and always has been property of the City of New Orleans. City streets are and always have been property of the City of New Orleans. That's established in the Save Our Parkways case. It is firmly entrenched under Louisiana law that a public body does not have the power to donate a public thing to a private party. But that would be a — you'd have to litigate whether they were acting ultra-vires or something. But my question is, is it in the record that at 298 and 303-304 that it was donated? Those do not — I do not believe that that constitutes a valid evidence of a donation, Your Honor. If you look at the ordinance, a donation under Louisiana law has to be accomplished by an authentic act, which requires a notary and two witnesses. Does Barbier make a determination on that point? He absolutely, and I can't — He said specifically that that was not a valid donation. I think he specifically recognized that the appellants had failed to offer evidence of a valid donation under Louisiana law. Moreover, there is a — this is not a factual question, Your Honor. There is a legal constitutional prohibition against the donation of public property. At this time, it would have been Article 57 of the Constitution of 1879, currently codified at Article 7, Section 21A of the Louisiana Constitution. Well, I mean, it seems like that would have to be litigated. Your Honor, we respectfully disagree that that issue has to be litigated. But what if, indeed, they had brought forth evidence of the donation, and you're saying that it's — it was ultra-vires and not actionable because it's against the Constitution? Well, Your Honor, let's also sort of — moving — I understand your point. I disagree with it. I think these are square. Well, I think that a city does not have the power to do what is constitutionally prohibited. And so there is no evidence in the record that the Beauregard Monumental Association, which at appellants' Exhibit 11 to their preliminary injunction briefing, page 9, the Beauregard Monumental Association dissolved. It is no longer a — it ceased to be a viable entity. And so the fact that you — But is your position that that entity, that this plaintiff, is not a successor in interest to the Beauregard — Monumental Association? Which I believe they said it was in this argument. There is absolutely no evidence in the record to support that finding. And, in fact, the evidence in the record, the exhibit that I cited in our — or it's actually plaintiff's exhibit, but it's cited at, I think, footnote 36 in our preliminary injunction brief, page 1474, makes very clear that the Beauregard Monumental Association is no more. Okay. Can I make sure? I want to make sure we're on the same page. Sure. And I think we are on the same page with this. It is not before the court whether or not these monuments are actually nuisances, is it? Absolutely not. That is not a federal issue. That is for the state — the city to decide. So whether or not the court agrees or not, you know, we're not to enter into whether Robert E. Lee actually abhors slavery and is not a — wouldn't — and this is a slight to him — that is not an issue for this federal court today, is it? I could not have said it better, Your Honor. This is not a referendum on the wisdom of the city council's policy. It is a discussion of whether the city has the power to regulate its own things. And that principle was firmly established in Singleman v. Morrison, which is the case that we think is very clear. Their claim for — their argument for a substantial legal claim turns on 2297. That's what they argued below. That's what they've argued here. But it isn't a frequently litigated civil law doctrine. Do you have any authority that it doesn't apply at all to protect public assets? Well, the — there is no case that has ever, ever extended negotiorum gestio, the reimbursement claim that negotiorum gestio creates, to ownership of public immovable. So, no, I don't have a case that says this can't happen because I think this is — it's unprecedented that someone would even make that argument. Let me sort of distinguish. The Kilpatrick case, which Mr. Jones cited as evidence of kind of their proposition here, is not. That is a case that ultimately decided not to apply negotiorum gestio, but it was about whether sort of attorneys had a claim against heirs of a will that they probated. It was — it had nothing to do with claiming or seizing an ownership in a movable property. There is simply no basis to extend that doctrine here. And doing so would violate these — a squarely settled prohibition against a seizure of public assets in satisfaction of a claim. And that is Article 12, Section 10c of the Louisiana Constitution. When the public — when a public body in Louisiana owes you money, you file a claim, you prove your damages, and then you go on a list and hope that that body appropriates funds sufficient to satisfy your claim. You don't get to, on the front end, sort of show up, say, I have a claim. By the way, I donated these services. I'm now going to convert those to an obligation, and pick and choose the pieces of public property that you like the best and that you think are sufficient to secure your claim. None of the indicia of a property right exist in this case. If we were to accept opposing counsel's invitation to put aside the 2297 argument and look for some other property theory speculating that maybe there are bits and pieces in the record that show continuity of ownership from an original donation, if we were to accept the invitation that we don't stick with the argument he's made here, and therefore we were to contemplate that there may be some provable property interest, moving on, was political process not given, even if you assume a property interest? Absolutely, Your Honor. A — the Constitution, either the Fifth or the Fourteenth Amendment, prohibit a government from depriving a citizen of property rights. It merely requires due process. And in most cases where you have a law of general applicability, due process is satisfied by the legislative process itself. Here, since they claim a property interest, Judge Barbier specifically found that there was ample process. And appellants have not even challenged that finding on appeal. They haven't briefed it. They haven't discussed it. There were five meetings before four public bodies, two before the city council, encompassing six hours of public comment. It is stipulated that the appellants attended these meetings. They participated meaningfully. And they made written submissions to these bodies, which appear in the record. So even if — even if you're willing to follow them down the rabbit hole and sort of break new ground in Louisiana property law, there is no basis to assail Judge Barbier 's findings that due process — But the city's legal argument is consistent, and it would apply to any monument. So the Holocaust monument, the monument to A.P. Toro, if you went through this political process, your position is the city could then remove, demolish, reinterpret whatever one does with public art. Absolutely, Your Honor. That is the crux of Singleman v. Morrison, which appellants — whether you remember their history or are doomed to repeat it or not, that's the city's philosophical decision to make. Absolutely. And I recognize there are strong feelings on both sides. But the Pleasant Grove City, Utah case that the Supreme Court decided really makes this principle in a very articulate way. Monuments are a form of public speech. They are government speech. And if we have the right to speak, we have the right to stop speaking and to remove the monuments. That is sort of the prerogative of the government. It is within our power. Do the monuments go to them when you take them down? If you take them down, who do they go to? The current plan, Your Honor, and I'm glad you mentioned this because I want to bring it back to a question that you opened with. Yes, whether there's been changed circumstances about the cranes. You do need to cover that. I appreciate that. The current plan, and this was — I think this has been up front, we've been up front about this, is — and these are in the mayor's comments, which are stipulated — they're contained in the factual stipulations, the statement from the mayor and various city council members. There is no desire to destroy these things, to tear them down. They are going to be removed and put into a city-owned storage facility until an ultimate determination can be made about sort of the appropriate place to remember them and how to sort of recognize them in the appropriate historical context. Now, with regard to whether circumstances have changed, when we filed our brief, we submitted an affidavit from Warren Shambo, our removal contractor, who sort of testified that the city intended to hire a reputable, skilled contractor to remove the monuments. Because the only evidence that appellants have ever put in about irreparable harm is not that monument removal can't be accomplished safely. It's that monument removal is unsafe when someone who is unskilled doesn't. And that is true of heart surgery, flying an airplane, virtually anything that requires skill. I thought they had evidence that because there's unknowable parts to it about the center of the monument, that no matter who did it, there's a risk. Maybe I'm wrong, huh? I respectfully disagree, Your Honor, that the — we stipulated a proffered testimony that the parties would offer. I believe it begins in the record at 2164, and that's when the document begins. But Warren — excuse me, Lawrence Robichaux, who's their rigging expert, offered no testimony whatsoever as to what might happen or the risk of harm if a skilled contractor were to remove it. And now, certainly, they articulated the factors associated with monuments that make removal an uncertain proposition and a difficult proposition, but there is no evidence that an unskilled contractor will cause harm. The day before the preliminary injunction hearing, the — so I — Warren Chambeau submitted an affidavit attesting to the fact that he agrees that unskilled people will harm monuments, but that we intend to hire a skilled person. But there's no skilled person available. Well, that — and let's — let's talk about that, Your Honor. The — on the day of the hearing, we were very upfront that we had lost our contractor, that they had backed out because he and his family received death threats, which puts us in a very difficult situation. We didn't lie to the Court. But he never had a contract. Well, those were in subsequent newspaper reports. Okay. Maybe I'm wrong. Those — It's not in the record. That's not in the record. So there are subsequent newspaper reports. After the general contractor dropped out of the project because people threatened to kill his family, and there — you know, there were reports of torched Lamborghinis, all of a sudden, it is not exactly shocking that parties would seek to distance themselves from this project. And so the — you know, the people are like, oh, well, we don't — you know, we weren't really retained. We weren't involved. These issues were put — so maybe it would have been inaccurate for me to say that they're not in the record, because the issues of Alcrane were put squarely to Judge Barbier in the request to stay pending appeal, which begins at 2311 at the record. And they said, look, Alcrane's not participating. Judge Barbier said, my opinion was not based on the participation of one particular contractor, and that's at 2366 to 67 of the record. It was based on the totality of the four factors that I weighed, in particular, your failure to prove an irreparable harm that is likely and the absence of any viable claim. Further, there is a significant interest that hasn't really been touched on yet, which is the injury to the public that results from this case. I understand that appellants are going to be denied the ability to see monuments. That's their irreparable harm. The injury to the city and to its people is the denial of the democratic process, which this Court has recognized. And that's not — I'm not familiar with that. I'm sorry. I've got one more question. Oh, sure. I'm sorry, Your Honor. Normally, though, even if there was a cognizable interest, even if it wasn't quite to the level of winning, necessarily, but the irreparable harm was so great and it was just a short time period. You know, if somebody's going to have their — be kicked out of their house, normally the thing is you wait until the end of the proceeding. That's just normally what courts do. Why shouldn't we wait? Assuming, arguendo, that there is even a cognizable legal point, if there were indeed cognizable legal argument, why shouldn't we wait a month or two to — because it's — you can't really — it's hard to move these giant things back and forth. And it's the same kind of thing of throwing someone out of their homestead or whatever. You know, those sorts of — we deal with those injunctive relief questions. A couple of responses, Your Honor. Number one, respectfully, they have not proven even a colorable — Right. — even an act. We were spotting them that for the purpose of the question. Assume that they had gotten one marble on the scale. Number one, the kind of continuance — well, I think the best answer is what I was about to say, which is that while the harm to them, compared to some of the harms that this Court has denied and dissolved preliminary injunctions, inability to see a monument for a short time or a long time — We're not talking about seeing the monument, only talking about destruction of the monument. Understood, Your Honor. But I do think that there is an important distinction between destruction of a monument — the monuments are not the litigants here. The injury sustained by appellants is the inability to view a work of art with which they identify. So I think there is a distinction to be drawn. Nevertheless, I think the countervailing public interest in this case is particularly important. Best case. What's the best case for that? For that case, there are two. Marilyn v. King, this Court's opinion in Planned Parenthood v. Abbott. And that harm to the democratic process just in closing isn't just an academic harm, which plaintiffs dismiss it casually. When folks are denied the democratic process, they seek other remedies and put the city in a difficult situation. And there was an expressed or at least an implied factual finding by the City Council that these monuments represent a risk to people and property and a risk of violent demonstration. And we've seen that. Well, that's not on them. You can't give a heckler's veto. Because other people might do bad acts that destroy things. It's not an interest that weighs in. That's like a heckler's veto almost. That's not appropriate. Your Honor, when the political process is frustrated, it puts the city in a difficult situation where it has to deal with the consequences of people who feel disenfranchised. I understand your concern about the heckler's veto. Nonetheless, the city is the party that has to deal with it, that has to hire the cops to go out and protect the monuments. So respectfully, Your Honor, we believe that viewed in its totality, particularly given the paucity of their legal showings, that Judge Barbier did not abuse his discretion. That's really the only thing that this Court could do, is to affirm the denial of the preliminary injunction. And in closing, I would just note that there is a stay in place, and we remain under that. So I don't know whether it's appropriate for the Court to revisit the granting of that, but we would, of course, ask for any expedited consideration that the Court would be willing to give. Thank you. Thank you. May it please the Court, good morning. My name is Peter Mansfield with the U.S. Attorney's Office here in New Orleans, appearing on behalf of the federal appellees, the Department of Transportation, the Federal Transit Administration, and their official capacity heads. This Court should find the appellant's claims against the federal appellees abandoned for inadequate briefing under Federal Rule of Appellant Procedure 28-A-8. And Judge Egginson cut right to the heart of this argument. That rule specifies that adequate briefing must contain contentions in the reasons for them, along with citations to authorities and parts of the record. In their opening brief, as Judge Egginson noted, those claims warrant a mere 15 lines of text on page 13, and if I could borrow Judge Higginbotham's phrase, which I think is apt, completely bereft of any legal authority. There's no citation of any precedent. There's no citation of any pertinent legal authorities, nor do they explain, and I think this is an important point, how a good-faith extension of the law would be required in order to accommodate their claims. They admit their claims are not controlled by precedent, but would require this good-faith extension. All the more reason that some detailed explanation is required as to how the law must be stretched or extended in order to accommodate their claims. And as you're representing the Federal Government, can I ask a quick question? Yes, ma'am. How does it work with regard to the National Historic Register? Does that not mean that the Federal Government has some sort of protective interest or not at all? It does not. Inclusion on the National Registry of Historic Properties is important if Federal money is going to be used on an undertaking that might have some adverse effect on property that is on the Register or perhaps is even just eligible for inclusion on the Register. That's only if Federal money is being used on an undertaking that might impact the property in some way. Private property can be on the National Register of Historic Properties. And it doesn't mean the government's coming in to protect it? Absolutely not. And it's not like the city of Burney or something where they're coming in to protect, to keep the church from expanding because it's a protected—you know what I'm saying. I understand what you're saying. National Register property can be privately owned, it can be sold, it can be mortgaged, hypothecated, or even torrented. If it is privately owned and it's registered, is there any case that says that gives a property right to the property holder? To the public? No, to the person, the property owner. To the property owner? The fact that they're on the registry or designated. I'm not aware of any independent of state law. Property rights spring from state law and not from Federal statutory inactions like the National Register. And there's not some provision where Federal taxpayer dollars are involved that the Federal government ever comes in and says, don't destroy this because it's on the Federal Register? It is not federally owned property, Your Honor. Do you have any insight into the 1874 monument that's sort of put aside? The Liberty Place monument. I do have insight into it, but I would agree with Judge Elrod's point. It's not before the court right now. Judge Barbier, in his opinion, it's towards the end of a pretty lengthy opinion, but he notes that the Liberty Place monument requires further litigation concerning that consent decree from 1992. The city's agreed that it's not going to touch Liberty Monument, absent some court blessing of its intent to move forward. So at this point right now, Judge Higginson, further litigation is required on the Liberty Monument. It's still pending in district court. The counterclaim has been filed, but issue really hasn't even been joined there. We have a pending motion to drop the two other Federal agencies that were involved in that consent decree. It's not the two I'm representing here today. It's actually the Advisory Council on Historic Preservation and HUD, but those two agencies are not before the court right now. We're just dealing with the three monuments, not the Liberty Place monument. I would anticipate we'll be back before the court at some point in time on Liberty Place, but not today. So we would urge the court to find abandonment due to inadequate briefing of the federal statutory claims. But if the court does decide to reach the merits, and let me just circle back to a point Judge Elrod made at the beginning, this is a 1292 interlocutory appeal. We have no final judgments under 1291. So further litigation is required in district court, irrespective of what this court does on the preliminary injunction. Matter of fact, we have a dispositive motion right now, Rule 56 motion. So if this court does reach the merits and declines to find abandonment, we would urge the court to affirm the district court's holding that the appellants have failed to demonstrate a likelihood of success on the merits of those federal statutory claims. There's four key findings that inform that holding. We've briefed them, but I'll briefly highlight them in my remaining time. First, the district court correctly concluded that three of the six projects identified in the appellant's complaint received no federal funding whatsoever. Therefore, there was no trigger for Section 106 or 4F studies to occur. Secondly, for one past transportation project that did receive federal funding, the Loyola Avenue streetcar line, that funding concluded in 2011. The Section 106 and 4F studies were published in 2011. And importantly, that triggers a six-month jurisdictional statute of limitations to file any claims for judicial review over those findings. Appellant missed that deadline by a couple years. Those are, I remember from your brief, those factual arguments. Do you perceive there to be any claim before us that there is a reversible error in that the district court truncated investigation into any issue, that the argument here is there was a failure to allow inquiry into the facts you're describing or any other facts? Is that issue before us? Appellants certainly did not request from the district court to continue the preliminary injunction hearing to allow for additional discovery. They were ripe and ready to go from day one. And they did not claim to the district court, you need to put off a preliminary injunction until we have an opportunity to conduct further. The last question I have, back on 1874, because to me that's the only one that's got sort of wrinkles, and I know it's carvable. If I remember, Mr. Logan below implied that that consent decree could be interpreted to apply to other monuments. Again, is that argument not here in front of us? They made that argument below. Judge Barbier emphatically rejected that argument. The briefing on that, I did not recall that that was adequately briefed either. But that argument would apply probably more so to the city than to us. And I see my time is up. If I can make one remaining point. Everyone else has gone over. Better to ask forgiveness than permission, I suppose. The only thing I want to emphasize in conclusion is the district court correctly concluded, as has been our argument from day one, that past federal funding for transportation and streetcar projects in and around the city of New Orleans has absolutely no factual, no legal, or no causal nexus to the removal or persistence of the monuments at issue before the court. Rather, it was action of the New Orleans City Council in December 2015, that's the undisputed causative agent that has the potential to change the status or the location of the monuments. I think we have your argument. Thank you, Your Honor. Good morning, Your Honors. Randy McKee here on behalf of the Regional Transit Authority. May it please the court, briefly, as it relates to the arguments that have been presented on behalf of the defendants, specifically the FTA, the Regional Transit Authority incorporates and realleges those particular arguments. The Regional Transit Authority, or the RTA, respectfully maintains that the district court properly held that the appellants were not timely in their challenge of the environmental findings of the UPT project. The UPT, excuse me, the FTA provided funding for essentially three projects that the RTA was involved in. The Loyola UPT project, the cemeteries transit project, and the streetcar line refurbishment. And the court was properly found that under, say, Barton Creek and Piedmont, that there were no environmental findings that would have withheld those projects moving forward, number one. Secondly, that there was no segmentation or inappropriate segmentation from the entire streetcar network of those three projects that received federal funding. Finally, the district court was proper, as the FTA and the RTA have informed this court in its briefs, that there was no nexus between the federally funded projects and the proposed removal of the monuments. The Regional Transit Authority would also want to emphasize that it is critical to note that the appellants have essentially abandoned their arguments as it relates to the issue of the FONSI or the finding of no significant impact that was made in these cases. There was a declaration made by Laura Wallace in regard to the FONSI that was implemented with those projects. And under United States v. Griffith, that was decided by this honorable court. It's a well-worn principle that the failure to raise an issue on appeal properly constitutes a waiver of that argument. With regard to any briefs that fail to cite any proper authority in support of that, that also constitutes a waiver. With regard to any other issues, the RTA respectfully joins in the city and the FTA and maintains that the district court properly denied the injunction filed by the plaintiffs. Thank you. You're stopping early? No. Well, he was only supposed to have two minutes, so I don't know why he had five, but that's okay. And with respect to the issue of the segmentation issue, the RTA would also like to emphasize that under Piedmont, when the court looks at the appropriate tests involving segmentation, involving, one, whether the system has a logical termini, secondly, whether there is substantial independent utility, thirdly, whether or not the project does not foreclose the opportunity to consider other alternatives, and four, whether or not the project is not in a manner that prevents the committing of federal funds for closely related projects. Under that test, the district court properly found that the RTA and that there was no improper segmentation of this matter, that each project was independent and stood on its own, that there's no nexus between the monuments and the placement of those monuments relative to the streetcar projects. This honorable court actually examined this issue in, say, Barton Creek and also examined the relevant highway loop that was being constructed and compared in two other cases, and so the RTA respectfully maintains that in those cases, the same situation exists whereby each streetcar project was separate and distinct and has no relationship whatsoever with regard to the placement of these monuments. With regard to any issue that the RTA should be in this litigation, or that the FTA, for that matter, should be in this litigation, based upon those issues, the defendants respectfully maintain that there should not be any issue. We have your argument. Okay. Unless there's something else that you haven't covered. No. If there are any other questions, I'd be happy to answer. Okay. Thank you. Thank you, Your Honor. My counsel, James Logan, was counsel for Louisiana Landmark Society in the underlying Shubert litigation. Could he have two minutes at the conclusion, two out of our five minutes, to talk about and address that issue? Did you request that? No, ma'am. We did not. No, sir. We have a rule about how to do that. I'm sorry. An injunction is appropriate and proper if any of the plaintiffs meet the four requirements with respect to any of their causes of action. So even though the court has expressed some skepticism and some doubt about some of the claims, some of the standing or property interests, if any of the claims can meet that standard, even if the others do not, an injunction is appropriate. And the Liberty Monument is one of the key elements of that, Your Honor. The city put all three monuments into one ordinance and treated them all the same. I thought Liberty put them to one side. Ma'am? I thought we put Liberty to one side. Well, this court did, but the city council did not. So what's that got to do with this appeal? It has to do with the fact that the Liberty Monument is anchored in place by a consent order that the parties are now trying to, that the city and the federal defendants are now trying to withdraw from. I just mention that because that is one of the claims that I think has absolutely been shown. Where is that in your brief? Just a page reference. Well, Your Honor, may I say something about that? The only issue that Judge Barbier decided was that he would deny the injunction. He did not rule on the merits. And we have not fully briefed the merits about NHPA, DOT. I'm asking you whether you briefed that you have a substantial legal claim. Where did you articulate this latest assertion of a legal claim in your brief to us that there could be spillover? It was mentioned below. I believe it. Your Honor, I can't quote the page. I believe we have made this argument time and again throughout this litigation. We have said that the Liberty Monument is an anchor that keeps all of these monuments in place. But we mentioned that in the context of the fact that— But Liberty is not before us on this appeal. Maybe I misunderstood it. Maybe I'm in a different argument here. It's not before you because it's only because the city has agreed not to act in the interim. Well, that's the only thing before us. Okay, Your Honor. I appreciate that. You're saying Liberty spills over into the other three, but the problem is you didn't put it in the brief. It was argued below. Your Honor, I don't know if maybe I misunderstand what the issue is before the court this morning. The four preliminary injunction criteria of what we've briefed to the court. With respect to what we have to show— There is no likelihood, a possibility that they're going to do anything on Liberty. They said no, that you've got—that's an ongoing matter. It's not before us. They've said no for the time being, but they've now moved to— Yes, I appreciate that, Your Honor. I'm sorry, but we have enough on our plate without talking about what might be down there. You're arguing something that's not even before us. I agree. With all due respect— I agree. The city did not erect the monuments, despite what Mr. Swinsik says. They were erected by the citizens of New Orleans after receiving donations of the land and the — and they were paid for by a subscription at the time people were donating money. The city is not the owner of the monuments. The city is not the owner of the land. We have made this claim throughout this litigation. The city can and has alienated public things. And in particular, we— So not owner, even if owner alienated. Is that — that's the two-parter? I apologize, Your Honor. What's that? You're claiming that the record establishes and the argument before us is that the city never owned or that it did own and then alienated? Never owned. Okay. It never owned the monuments. They were — the land was donated, and they were paid for by public subscription. That is in the record on appeal. The city has no plan and no idea how it's going to take them down. Donated in fee — I mean, in fee. I mean, in owner. Civilian terms, Your Honor. Donated the property. I don't believe we use the term fee simply. Whatever. It would be a donation. Yes, ma'am. The city has no plan to take them down. The city has no contractor in place. The city has no timeline. But if the court does not let the case remain in place, if this court doesn't preserve the status quo, we will return to Judge Barbier. We will be litigating there sometime the rest of this year and early next year. And the monuments may — the city may attempt to bring them down at that time. They may damage them. And all of the work that has gone into this case will be thrown out the window if the court doesn't let those monuments remain in place. There's no harm whatsoever to the city to let them rest in peace for the next year while we bring this litigation to conclusion. Thank you.